UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL LABOR RELATIONS
BOARD REGION #32,

Plaintiff,

v.

AMERICAN AUTOMOBILE
ASSOCIATION OF NORTHERN
CALIFORNIA, NEVADA & UTAH,

Defendant.

Case No.  24-cv-07978-HSG

**ORDER GRANTING IN PART AND
DENYING IN PART PETITION FOR
TEMPORARY INJUNCTION UNDER
SECTION 10(j)**

Re: Dkt. No. 1

Before the Court is a petition brought by Christy J. Kwon, Regional Director of Region 32 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board ("Petitioner"), against American Automobile Association of Northern California, Nevada, & Utah ("Respondent") under Section 10(j) of the National Labor Relations Act ("NLRA"), as amended, 29 U.S.C. § 160(j).  Dkt. No. 1.  The Court GRANTS IN PART and DENIES IN PART the petition.

## I.    BACKGROUND

This petition seeks temporary injunctive relief pending the final disposition of two administrative matters currently before the National Labor Relations Board ("the Board") alleging that Respondent is engaging in unfair labor practices.  Dkt. No. 1 ("Pet.") at 1.

In June 2021, Respondent's insurance sales agents in Northern California organized a union and selected Teamsters Local 665 ("the Union") as their collective-bargaining representative.  Dkt. No. 16 ("Mot.") at 9.  The Union filed several unfair labor practice charges against Respondent beginning in June 2021.  Pet. at 5–6.  Petitioner then brought an initial complaint against Respondent in June 2022 ("AAA I"), alleging that Respondent violated various

sections of the NLRA.  The relevant allegations include:

- Investigating and terminating employee Priscilla Gaines-Holladay, a strong supporter of the Union, in retaliation for her union activism;

- Eliminating bargaining unit positions in retaliation for employees organizing a union;

- Diverting work away from the bargaining unit in retaliation for organizing; and

- Changing policies for unit employees regarding time and attendance, work from home, and paid time off in retaliation for organizing and without giving the Union notice and opportunity to bargain.

Pet. at 12–13.  AAA I was tried before an Administrative Law Judge (ALJ) between May 2023 and October 2024, and post-trial briefing is due on March 25, 2025.  *Id.* at 7.

Petitioner filed a second complaint against Respondent ("AAA II") in August 2023 based on additional unfair labor practice charges.  Pet. at 9.  AAA II alleges that Respondent engaged in unfair labor practices by:

- Unilaterally changing employee's working conditions without reaching an overall good-faith impasse in bargaining for a first contract;

- Implementing its last, best, and final contract offer without first reaching a good-faith impasse;

- Bargaining in bad faith; and

- Threatening employees and disparaging the union in response to organizing.

*Id.* at 12–13.  Trial in AAA II began in January 2025.  *See id.* at 11.

In November 2024, Petitioner sought a temporary injunction in this Court under Section 10(j).  Pet. at 1.  The petition seeks various forms of injunctive relief on the basis that Petitioner is likely to succeed in establishing that Respondent committed the violations alleged in AAA I and AAA II.  *Id.* at 11.

Respondent opposes the petition.  Dkt. No. 36 ("Opp.") at 36.  The Court held a hearing on the petition on January 9, 2025, and ordered the parties to identify in the record Respondent's and the Union's communications related to the declaration of impasse.  Dkt. No. 48.  The parties timely provided their joint supplemental filing, and the Court took the petition under submission.

1    Dkt. No. 50.

2    **II.    LEGAL STANDARD**

3        Section 10(j) allows the Board to petition the district court for temporary relief or

4    restraining order after issuing an unfair labor complaint.  29 U.S.C. § 160(j).  The court may grant

5    such relief "as it deems just and proper."  *Id.*  "In granting an injunction under § 10(j), district

6    courts should consider traditional equitable criteria."  *Hooks ex rel. N.L.R.B. v. Nexstar*

7    *Broadcasting, Inc.*, 54 F.4th 1101, 1107 (9th Cir. 2022) (citation and internal quotation marks

8    omitted).  "This consideration is viewed through the prism of the underlying purpose of § 10(j),

9    which is to protect the integrity of the collective bargaining process and to preserve the Board's

10    remedial power while it processes the charge."  *Id.*  The traditional equitable factors the district

11    court considers are "(1) the likelihood of the moving party's success on the merits; (2) the

12    likelihood that the moving party will suffer irreparable injury if injunctive relief is not granted; (3)

13    the extent to which the balance of equities favors the respective parties; and (4) [whether] an

14    injunction is in the public interest."  *Id.* (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20

15    (2008)); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 351 (2024) (holding that "district

16    courts must apply the traditional four factors articulated in *Winter* when considering the Board's

17    requests for a preliminary injunction under § 10(j)").  Alternatively, "serious questions going to

18    the merits and a balance of hardships that tips sharply towards [Petitioner] can support issuance of

19    a preliminary injunction, so long as [Petitioner] also shows that there is a likelihood of irreparable

20    harm and that the injunction is in the public interest."  *Frankl v. HTH Corp.* (*Frankl*), 650 F.3d

21    1334, 1356 (9th Cir. 2011) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

22    (9th Cir. 2011)).[1]

23    _____

24    [1] Some post-*Winter* Ninth Circuit decisions appear to have defined likelihood of success on the
merits in a way that could suggest that a district court should defer to the Board's factual or legal

25    determinations.  *See Frankl ex rel. N.L.R.B. v. HTH Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012)
("In cases like this, moreover, we owe the Regional Director special deference because the Board

26    took the rare step of endorsing the Director's Section 10(j) petition.");  *Frankl*, 650 F.3d 1356
(holding that petitioner "can make a threshold showing of likelihood of success by producing

27    some evidence to support the unfair labor practice charge, together with an arguable legal
theory").  It is not clear to the Court whether these principles remain viable after *Starbucks*.  *See*

28    602 U.S. at 351 (rejecting Sixth Circuit "reasonable cause" standard under which, among other

United States District Court
Northern District of California

1    **III.    DISCUSSION**

2        The Court next addresses the sufficiency of the Board's petition as to each set of

3    allegations asserted in AAA I and AAA II.

4        **A.    AAA I**

5        AAA I alleges that Respondent violated the NLRA by taking various actions in 2021 and

6    2022 to retaliate against employees for organizing a union.  Pet. at 12–13.  The complaint asserts

7    that Respondent investigated and terminated employee Priscilla Gaines-Holladay in July 2021 in

8    retaliation for her union leadership.  Mot. at 12–15.  In addition, Respondent allegedly stopped

9    hiring unit insurance agents in February 2021 to retaliate against the Union.  *Id.* at 17.  Respondent

10    also purportedly began diverting work opportunities from unit agents during the July, August, and

11    September of 2021, and making unilateral changes to agents' working conditions during that time

12    and in April 2022, such as eliminating work from home and flexible work hours and changing

13    paid-time off policies.  *Id.* at 18, 20.  Based on these allegations, Petitioner asks the Court to

14    enjoin Respondent from investigating employees or retaliating against them for union activities;

15    enforcing any policies unilaterally implemented "since the time the Union won election" in June

16    2021; and diverting work away from unit employees.  Pet. at 21, 23.  Petitioner also asks the Court

17    to affirmatively order Respondent to reinstate Gaines-Holladay and to restore all bargaining unit

18    work "as it existed prior to January 1, 2021."  *Id.* at 22–23.

19        **i.    Irreparable Harm**

20        The Court may not order preliminary relief unless Petitioner can show that irreparable

21    ───────────────────

22    things, the Board did not have to "convince the court of the validity of its theory of liability, as
long as the theory is substantial and not frivolous," because that standard "lower[ed] the bar for

23    securing a preliminary injunction by requiring courts to yield to the Board's preliminary view of
the facts, law, and equities"); *see also Hooks*, 54 F.4th at 1114 (reiterating that "[t]he propriety of

24    injunctive relief must be evaluated on a case-by-case basis in accord with traditional equitable
principles and without the aid of presumptions or a 'thumb on the scale" in favor of issuing such

25    relief") (cleaned up).  *Starbucks* held that "deference to what is nothing more than an agency's
convenient litigating position is entirely inappropriate."  602 U.S. at 351 (citation and internal

26    quotation marks omitted).  In applying *Winter*, the Court endeavors to follow the Supreme Court's

27    recent direction, while noting that any arguable tension stemming from older Ninth Circuit cases
regarding the applicable standard would not lead to a different outcome on this motion.

28

United States District Court
Northern District of California

1    harm is likely to occur in the absence of such relief.  The Court finds that Petitioner has not met

2    this threshold as to the violations alleged in AAA I.

3          Petitioner argues that the unfair labor practices alleged in AAA I have caused irreparable

4    harm by eroding support for the Union among employees, and such harm is ongoing because

5    support for the union is "likely to continue diminishing as bargaining unit employees see that

6    Respondent can act with impunity . . . thus rendering the Union ineffective against Respondent's

7    unlawful conduct in the eyes of employees."  Pet. at 18.  Similarly, Petitioner argues that the

8    termination of union activist Gaines-Holladay has had a chilling effect on other employees'

9    exercise of their collective bargaining rights, which "will intensify as time lapses."  *Id.* at 19.

10   According to Petitioner, "[w]ith the passage of time, this lost support for the Union cannot be

11   restored by a final Board order," and therefore can only be averted by injunctive relief.  Dkt. No.

12   44 ("Reply") at 18.

13         Respondent counters that the alleged violations are based on events that happened more

14   than three years ago, such that any alleged resulting harm "has already occurred and an injunction

15   would, therefore, be an 'empty formality.'"  Opp. at 26 (citing *Hardy-Mahoney for & on behalf of*

16   *Nat'l Lab. Rels. Bd. v. Prime Healthcare Servs.*, No. 317CV00216MMDVPC, 2017 WL 2192970,

17   at *5 (D. Nev. May 18, 2017)).

18         In the 10(j) context, the purpose of an interim injunctive order is to prevent an unfair labor

19   practice from "reach[ing] fruition" while Board proceedings are pending.  *Frankl*, 650 F.3d at

20   1362 (citation and internal quotation marks omitted).  Accordingly, "irreparable injury is

21   established if a likely unfair labor practice is shown along with a present or impending deleterious

22   effect of the likely unfair labor practice that would likely not be cured by later relief."  *Id.*  Courts

23   have recognized that the continuation of an employer's failure to bargain in good faith causes

24   irreparable harm by diminishing the benefits of unionization, such that a court order may be

25   necessary to prevent union support from weakening over time to the point where an ultimate

26   Board decision may not be effective.  *See id.* at 1363.

27         But here, so much time has passed since the conduct at issue in AAA I is alleged to have

28   taken place that it is doubtful an interim order is necessary to ensure the efficacy of the Board's

United States District Court
Northern District of California

5

order in AAA I. On reply, Petitioner maintains that "the mere passage of time does not prevent issuance of injunctive relief," citing cases in which courts granted 10(j) injunctions that the Board sought more than a year after bringing its initial complaint. Reply at 18. While the Court agrees that "delay by itself is not a determinative factor in whether the grant of interim relief is just and proper," delay is significant "if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 965 (9th Cir. 2010) (citation and internal quotation marks omitted). And under the circumstances here, the 28-month delay between the AAA I complaint and the related 10(j) petition is significant because Petitioner has failed to show that an injunction would be more effective to remedy the harm allegedly caused by the AAA I violations than an order by the ALJ or the Board.

For one, Ms. Gaines-Holladay was terminated almost three and a half years ago in July 2021, and nothing in the record suggest that she has not obtained other employment since her termination. *See* Mot. at 14. And beyond that, as Respondent points out, the argument that the termination of this single employee threatens to continue to chill union activity is undercut by the fact that the parties bargained for almost two years after her termination. *See* Opp. at 27, fn. 2. Similarly, given that the other allegations at issue in AAA I occurred well over two years ago, *see* Mot. at 20 (latest AAA I allegation occurred in April 2022), the evidence Petitioner cites to demonstrate the threat of further diminishing support for the Union is also dated. Petitioner relies on a decertification petition circulated among employees in July 2023 and affidavits taken in July and August 2023 stating that former members of the bargaining committee no longer support the Union. *Id.* at 30. This evidence does not show that the claimed harm of diminished union support stemming from the alleged AAA I unfair labor practices is likely to "substantially increase[e]" absent a court order. *Hardy-Mahoney v. Everport Terminal Servs., Inc.*, No. 17-CV-00804-RS, 2017 WL 1092325, at *4 (N.D. Cal. Mar. 23, 2017). In sum, "[t]he record here does not clarify how interim relief now would be more effective than it would be after the ALJ reaches a decision and recommends relief, or after the Board renders a final adjudication." *Cowen v. Mason-Dixon Int'l*, No. 2:21-CV-05683-MCS-JC, 2021 WL 3852184, at *6 (C.D. Cal. Aug. 27, 2021).

United States District Court
Northern District of California

Moreover, many courts that have issued 10(j) injunctions despite significant delay between the alleged violations and the filing of the petition have "had the benefit . . . of an ALJ's legal analysis and conclusions" upholding the Board's allegations.  *See Frankl*, 650 F.3d at 1363; *see also Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 545 (4th Cir. 2009) (delay outweighed by strong showing of likelihood on the merits given that ALJ had already determined violations were committed); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) ("Because the ALJ's fact finding here aided the district court's adjudication of Overstreet's petition, delay alone is not dispositive.").  By contrast, in this case, the ALJ's decision in AAA I is forthcoming after the parties submit their post-trial briefs in about two months (on a schedule Petitioner presumably agreed to).  Pet. at 7.

Accordingly, the Court finds that, because "a preliminary injunction would not actually make a practical difference here," the relief sought as to the AAA I allegations is more appropriately granted in the administrative proceedings if justified by a fully-developed record, rather than by this Court on a hastily-assembled one.  *See McDermott*, 593 F.3d at 965; *see also Cowen*, 2021 WL 3852184, at *6 (in the context of a significant delay, "the forthcoming conclusion of the administrative proceedings before the ALJ signals that interim relief is unwarranted").  Because Petitioner has failed to show that the unfair labor practices alleged in AAA I are likely to cause irreparable harm in the absence of preliminary relief, the portion of the petition seeking relief on the basis of AAA I is **DENIED**.

## B.    AAA II

The violations alleged in AAA II are more recent.  The complaint's core allegation is that Respondent unlawfully declared a bargaining impasse in June 2023, and on that basis was not permitted to implement its Last, Best, and Final Offer ("LBFO") in August 2023.  The LBFO enacted certain policy changes, most notably the policy that agents' commissions earned on renewed insurance policies ("renewals") would be eliminated starting February 1, 2025.  Pet. at 12–13, 17.  The portion of the petition relevant to AAA II seeks to enjoin Respondent from implementing the LBFO policies and to require Respondent to re-engage in good faith bargaining for a minimum of two days per week for at least 6 hours per session until an agreement or good

United States District Court
Northern District of California

United States District Court
Northern District of California

faith impasse is reached.  *Id.* at 22, 23.

### ii. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, Petitioner must show a "probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [the Court of Appeals] would grant a petition enforcing that order, if such enforcement were sought."  *Frankl*, 693 F.3d at 1062.

Petitioner advances two arguments that it is likely to succeed on the merits of its claim that Respondent unlawfully declared impasse.  First, Petitioner argues that the Board is likely to find that Respondent bargained in bad faith, making the impasse it declared unlawful because "impasse can never exist in the presence of bad faith bargaining."  Mot. at 25.  Second, Petitioner argues that "impasse cannot be reached in the presence of a serious unremedied unfair labor practices that affect the negotiations."  *Id.*

"When parties are engaged in negotiations for a new CBA, in general, 'an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole.'"  *Hooks v. Hood River Distillers, Inc.*, No. 3:21-CV-268-SI, 2021 WL 2142609, at *8 (D. Or. May 26, 2021) (quoting *Bottom Line Enters.*, 302 NLRB 358, 374 (1991), *enf'd*, 15 F.3d 1087 (9th Cir. 1994)).  To determine whether an impasse is lawful, the Board considers "[t]he bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations."  *Taft Broad. Co.*, 163 NLRB 475, 478 (1967), *enf'd* 395 F.2d 622 (D.C. Cir. 1968).

First, the Court rejects Petitioner's contention that the mere existence of unfair labor practices (ULP) charges against Respondent precludes a finding of good faith impasse.  At oral argument and in her papers, Petitioner cited *Richfield Hosp., Inc.*, 369 NLRB No. 111 (June 26, 2020), for this proposition.  *See* Mot. at 25; Reply at 15.  But importantly, in *Richfield*, the Board found that the unremedied ULPs at issue "necessarily had serious adverse effects" on later

1    bargaining because the employer had failed to cure them after the violations had been sustained by

2    an ALJ and reaffirmed by the Board.  *See Richfield*, 369 NLRB at *3.  The other case Petitioner

3    cited, *Alwin Mfg. Co. v. N.L.R.B.*, 192 F.3d 133 (D.C. Cir. 1999), also involved unremedied ULPs

4    that previously had been found by an ALJ and sustained by the Board.  *See id.* at 138–39.

5    Moreover, the D.C. Circuit noted that the Board had denied the existence of a per se rule "that the

6    existence of the ULPs necessarily meant that good-faith bargaining could not occur."  *See id.*

7    These cases thus do not support Petitioner's argument that the existence of alleged ULP violations,

8    as opposed to factually-sustained violations that an employer has failed to remedy in response to a

9    court order, necessarily foreclosed Respondent's declaration of impasse here.  As such, the Court's

10   analysis focuses on the parties' course of dealing in bargaining to determine whether Respondent

11   bargained in good faith, so as to make the impasse lawful.

12        Petitioner first argues that Respondent's bad faith bargaining tactics are evidenced by its

13   conduct over several years, from the very start of negotiations.  Mot. at 23.  This includes its

14   unilateral determination that it would bargain only on a monthly basis; its wasting of time in the

15   first bargaining meeting; and its refusal to explain its positions or provide counterproposals.  *Id.*

16   Petitioner further argues that Respondent's proposal to eliminate renewal commissions itself

17   demonstrates Respondent's bad faith approach to bargaining because the proposal is so extreme

18   that no rational party would be willing to accept it.  *Id.* at 24.  Finally, Petitioner argues that in the

19   weeks prior to the declaration of impasse, the Union made additional concessions and

20   counterproposals that Respondent failed to consider, and contends that the Union clearly

21   communicated to Respondent that it disputed the existence of the impasse.  Reply at 16.

22        Respondent's version of events is that after at least 29 bargaining sessions and mediation,

23   the parties were close to finalizing an agreement, with the only open term being the renewal

24   commissions issue.  Opp. at 19.  During negotiations, Respondent proposed to eliminate renewal

25   commissions 18 months after the first contract was enacted, and offered that any agent could elect

26   to leave AAA and still receive severance when those commissions were eventually eliminated.  *Id*.

27   According to Respondent, the issue was ultimately a "dealbreaker" for both parties, since the

28   Union expressed to Respondent "in no uncertain terms" that it would not agree to a contract that

United States District Court
Northern District of California

1   included the elimination of renewal commissions at all. *Id.* at 20. Respondent thus informed the

2   Union that it would not move any further on the issue. *Id.* The Union then voted on, and

3   eventually rejected, an agreement that included Respondent's last proposal on renewal

4   commissions. *Id.* The parties engaged in further bargaining in April and May 2023 but were still

5   at a "deadlock" on the "single remaining issue" of the commissions. *Id.* In June 2023,

6   Respondent then declared that the parties were at an impasse and informed the Union that on

7   August 1, 2023, it would implement its last, best, and final offer, including the policy that renewal

8   commissions would be eliminated in 18 months. *Id.*

9       The Court finds that Petitioner has not established that Respondent likely negotiated in bad

10  faith throughout the entire bargaining period. The claim that Respondent "refused" to bargain

11  more than once per month is belied by the Union's admission that bargaining occurred more

12  frequently than that on a number of occasions. *See* Dkt. No. 16-5 at 16 (stating that the parties

13  met 12 times between June and December of 2022). Further, the record shows that the parties

14  were able to reach tentative agreements on several provisions over the years. *See* Dkt. No. 44-3 at

15  15–42 (Union's documentation of tentative agreements); Dkt. No. 16-5 at 16 (parties were

16  "making modest progress on language of 14 proposals and the parties reached tentative

17  agreements on various non-economic provisions" during this period). Finally, the evidence shows

18  that Respondent presented the Union with economic counterproposals during negotiations,

19  including moving from eliminating renewal commissions all at once, to a 12-month extension

20  period, then to an 18-month period, while providing a rationale for each proposal. *See id.* at

21  13–16.

22      The Court also finds that Petitioner has not shown that the Board is likely to deem

23  Respondent's proposal to eliminate renewal commissions so irrational as to evidence bad faith

24  bargaining. Specific proposals may be considered evidence of bad faith tactics if the proposed

25  term was "clearly designed to frustrate agreement on a collective-bargaining agreement." *In Re*

26  *Liquor Indus. Bargaining Grp.*, 333 NLRB 1219, 1220 (2001). Courts have thus found that

27  proposals that vest employers with exclusive and unilateral control in the setting of wages or other

28  working conditions evidence bad faith. *See id.* at 1221; *see also A-L King Size Sandwiches, Inc.*,

265 NLRB 850, 859 (1982) (terms employer proposed giving itself "total control over virtually every significant aspect of the employment relationship," including wages, evidenced bad faith). Here, while the proposal to eliminate renewal commissions affects an important but limited aspect of agents' income, Petitioner does not argue that Respondent proposed other terms that would give it exclusive and unilateral control over wages or working conditions more generally.[2]  And as mentioned, Respondent adjusted the proposal twice in an effort to reach agreement with the Union.  *See* Dkt. No. 16-5 at 17.  Finally, Petitioner's assertion that eliminating renewal commissions is an "extreme" proposal that no rational party could ever accept is belied by the fact that the Union eventually took the position that it might be open to the elimination of those commissions if the agents' base salaries increased, as will be discussed.  *See* Dkt. No. 50-1 at 3.

However, the Court does find that Petitioner has established at least serious questions going to the merits of its claim that Respondent's declaration of impasse was unlawful based on the parties' communications in the negotiations preceding impasse.  "The Board has defined impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile."  *Southcoast Hosps. Grp., Inc. & Massachusetts Nurses Ass'n*, 365 NLRB 973, 998 (2017).  "[I]t is not sufficient for a finding of impasse to simply show that the employer had lost patience with the Union.  Impasse requires a deadlock.  In order to find an impasse, both parties must believe they are at the end of their rope."  *Id.* (citation and internal quotation marks omitted).  Respondent maintains that its declaration of impasse was lawful because both sides were at "irreconcilable odds" on the central issue of renewal commissions.  Opp. at 20; Dkt. No. 50-1 at 17.  But the evidence, largely based on Respondent's own contemporaneous notes of the bargaining sessions leading up to the impasse, undermines the credibility of this characterization.

In April 2023, the Union rejected Respondent's proposal to eliminate renewal commissions 18 months after the contract was enacted.  Dkt. No. 38 at 3.  Before the vote,

---

[2] Petitioner briefly suggests that Respondent's proposed management rights clause also demonstrates bad faith, but Petitioner fails to describe the actual terms of the proposal or explain how it constitutes bad faith.  Mot. at 24.  Accordingly, the Court will not consider it.

United States District Court
Northern District of California

Respondent had characterized this offer as "the best that it could do." Dkt. No. 16-5 at 17. Still, the Union invited Respondent back to the table, and bargaining continued on May 19, 2023. *Id.* at 18.

In the bargaining session, the Union presented six demands, including keeping renewal commissions. Dkt. No. 50-1 at 2.[3] Another demand was a cost-of-living increase to the salaries of Group B agents (those who do not receive renewal commissions). *Id.*; Dkt. No. 44-3 at 44. The Union initially stated that it would not agree to any proposal that ended renewal commissions before the CBA expired. Dkt. No. 50-1 at 2. Respondent replied that the commissions issue seemed to be a "dealbreaker," and asked if there was any chance the Union would move on the issue. *Id.* The Union negotiator responded, "Well that is what I am hearing, but we are always willing to hear your proposal." *Id.* at 3. The Union then did offer a counterproposal, stating that if the base salary for Group B agents was large enough, the Union might be willing to "get rid of renewals." *Id.*[4] The Union appears to have offered $500,000 as an illustrative base salary number (and Respondent's later notes reflect that it understood this to be a "facetious" example). *Id.* at 4. In response, Respondent stated that "talking realistic numbers we do not see your position changing." *Id.* at 3. The Union suggested that the parties go through the other items on the table and then circle back to the commissions issue, but Respondent again stated, "there is no situation we can see where we change our position" on that issue. *Id.*

The parties then reconvened a few days later on May 23. Dkt. No. 50-1 at 4. According to Respondent's negotiator's notes, the brief exchange that follows is the final official bargaining communication between the parties before Respondent declared impasse:

> Respondent:   "If you are not moving on [renewals] which is a dealbreaker, [other issues]
>
>                don't matter. So [until] you have a counter that does not include [renewals]

---

[3] The following summary of the parties' statements in the final bargaining sessions is based on Respondent's lead negotiator's bargaining notes, found at Dkt. No. 50-1, Exh. 1, at 2–6. This account is also corroborated by the contemporaneous notes of Petitioner's negotiator and assigned notetaker. *See id.*, Exh. 2, at 10–15; Dkt. No. 44-3 at 45.

[4] Under Respondent's proposal, after renewal commissions were to be eliminated, Group A agents (agents who previously received renewal commissions) and Group B agents (agents who did not receive renewal commissions) would all be paid pursuant to the same terms. *See* Opp. at 19.

United States District Court
Northern District of California

1                     we do not see where else there is to go here."

2         Union:          "We told you last time that if [base salary] is big enough we could

3                     potentially get rid of [renewals]."

4       Respondent:   "No, you said if $500k went into [base salary] you could.  We know that

5                     was facetious, but there is no amount we see that you would take and we

6                     would offer on [base salary] that gets rid of [renewals]."

7         Union:          "So you have no counter today?"

8       Respondent:   "Unless you have a counter offer to our Feb offer that you voted on that does

9                     not include renewals, then you have already seen the last and best offer we

10                    are going to make."

11        Union:          "We both know our options going forward.  If you decide you are ready to

12                    negotiate more, let us know."

13      Respondent:   "If you are prepared to make a counter that does not include renewals, let us

14                    know."

15        Dkt. No. 50-1 at 4, 6.  Then, a few weeks later, on June 15, 2023, Respondent sent a letter

16 to the Union declaring the parties had reached impasse.  Dkt. No. 16-5 at 32.  The letter stated that

17 the parties "were not able to reach agreement on a central and fundamental issue for both parties,

18 namely, the treatment of renewal commissions for the Group A agents," and that "both parties

19 have indicated that they consider their respective positions on renewals as a 'deal breaker' and one

20 that they are not willing to move on."  *Id.*  The letter concluded that because the parties were "at

21 irreconcilable odds on this central issue," they had "reached an impasse in the negotiations."  *Id.*

22 Further, Respondent would implement the terms of its final offer on August 1, "[g]iven that further

23 negotiations would be futile in light of the parties' entrenched positions on renewals."  *Id.*

24        The Union responded six days later declaring that it "reject[ed] the Company's

25 characterization that the parties [were] at an impasse."  Dkt. No. 50-1 at 17.  The letter noted that

26 Respondent was obligated to immediately advise the Union what terms Respondent would be

27

28

implementing on August 1.  *Id.*[5]

The Court finds that these communications raise at least serious questions going to the merits of Petitioner's claim that the impasse was not declared in good faith.  For a legitimate impasse to occur, "both parties must be unwilling to compromise," and impasse does not occur "merely because [a union] is unwilling to capitulate immediately and settle on [an employer's] unchanged terms."  *Grinnell Fire Prot. Sys. Co. v. N.L.R.B.*, 236 F.3d 187, 199 (4th Cir. 2000) (citations and internal quotation marks omitted).  This is because "futility, rather than mere frustration, discouragement, or apparent gamesmanship, is necessary to establish impasse."  *Id.* Accordingly, an assertion of impasse may not be premised on an employer's "own unwillingness—rather than that of the Union—to compromise."  *Id.*

The parties' final pre-impasse communications suggest that Respondent may have been the only party that was unwilling to compromise at the time it declared impasse.  Respondent's final communication to the Union was that it would entertain "a counter that [did] not include renewals."  But the Union had already presented such an offer by stating that it would forego renewal commissions if agents' base salaries were raised.  Respondent could argue that the Union's offer was not "real," on the ground that $500,000 is, objectively, an extremely large amount for an agent's base salary.  *See Saunders House v. N.L.R.B.*, 719 F.2d 683, 688–89 (3d Cir. 1983) (proposal that does not constitute "real movement" between the parties does not preclude good faith impasse).  However, as mentioned, Respondent's own notes indicate that it viewed that number as "facetious."  *See* Dkt. No. 50-1 at 4.[6]  In light of the Union's proposal, the parties' negotiations appear to contradict Respondent's argument in its opposition to the petition that Respondent declared the impasse only after the Union had expressed "in no uncertain terms" that it would not agree to a contract that included the elimination of renewal commissions.  Opp. at

---

[5] The Union's letter also stated that it would respond to Respondent's assertion of impasse "by separate cover."  Dkt. No. 50-1 at 17.  But if there was any follow-up communication, no party has identified it in the record.

[6] The Union negotiator's pre-call preparation notes indicate that the Union considered $55,000 as a potential "cost of living adjustment to [the] base" salaries of Group B agents (which presumably would have also applied to Group A agents once renewal commissions were eliminated), though it is not clear whether this number was communicated to Respondent.  *See* Dkt. No. 44-3 at 44–45.

1    20. And similarly, the reference in Respondent's declaration of impasse to both parties' positions

2    on the commissions issue as "entrenched" appears inconsistent with the fact that the Union had

3    just moved its position. *See* Dkt. No. 16-5 at 32.

4        Further, the record suggests that Respondent failed to respond in good faith to the Union's

5    proposal. The good faith bargaining requirement did not require Respondent to "make

6    concessions or yield any position fairly maintained." *Frankl*, 650 F.3d at 1358 (citation and

7    internal quotation marks omitted). But an employer still must "make some reasonable effort in

8    some direction to compose [its] differences with the union." *See id.* at 1359. As such, a "take it or

9    leave it" approach may be found to evidence bad faith where "there was no substantial

10   justification offered for refusing to discuss" a proposal. *See N. L. R. B. v. Gen. Elec. Co.*, 418 F.2d

11   736, 757 (2d Cir. 1969).

12       Here, it would be reasonable for the Board to conclude that Respondent's answer to the

13   Union's proposal was not sufficient to constitute good faith consideration of the proposal. After

14   the Union proposed that it might agree to an elimination of renewal commissions if Respondent

15   agreed to increase agents' base salaries by an acceptable amount, Respondent declared that

16   "talking realistic numbers we do not see [the Union's] position changing"—without actually

17   putting a number it considered realistic on the table and allowing the Union to respond to it. *See*

18   Dkt. No. 50-1 at 2. And in the final bargaining session, Respondent declared that "there is no

19   amount *we could see* that [the Union] would take and we would offer." *See id.* at 6 (emphasis

20   added). But that assertion was necessarily speculative: Respondent essentially predicted a

21   deadlock on the commissions issue based on its own assumptions about the terms it believed the

22   Union would accept, rather than the Union's actual response to a counteroffer from Respondent.

23   This approach was likely insufficient to constitute a good faith justification for outright rejecting

24   the Union's proposal. *See Nat'l Ass'n of Broad. Emps. & Technicians-Commc'ns Workers of Am.,*

25   *Loc. 51, AFL-CIO v. Nat'l Lab. Rels. Bd.*, No. 22-1782, 2024 WL 3439582, at *2 (9th Cir. July

26   17, 2024) (affirming Board's finding of failure to bargain in good faith based in part on evidence

27

28

United States District Court
Northern District of California

that employer "summarily rejected Union proposals").[7]  Because the Union offered an at least facially legitimate counterproposal that Respondent did not meaningfully consider or answer, it would be reasonable for the Board to conclude that Respondent was not warranted in assuming that further bargaining would be futile.  *See Saunders House*, 719 F.2d at 688 ("A concession by one party on a significant issue in dispute precludes a finding of impasse even if a wide gap between the parties remains because under such circumstances there is reason to believe that further bargaining might produce additional movement.").

Respondent ultimately has the burden of proving that impasse actually existed.  *See Grinnell*, 236 F.3d at 196.  The record presented on this motion does not support Respondent's characterization that both parties were at a deadlock when Respondent declared impasse, and suggests that Respondent failed to bargain in good faith during the final pre-impasse negotiations. Accordingly, the Court concludes that Petitioner has established at least serious questions going to the merits of its argument that the Board is likely to find that impasse was not declared in good faith and that Respondent's unilateral implementation of the LBFO was unlawful on that basis.

### iii.  Irreparable Harm

#### a.  Elimination of Renewal Commissions

The Court finds that Petitioner has also sufficiently established that irreparable harm is likely to occur if the term of the LBFO eliminating renewal commissions is allowed to take effect as planned on February 1.  Petitioner argues that eliminating renewal commissions will severely reduce the income of a majority of the agents in the bargaining unit, based on the affidavits of three agents stating that renewal commissions account for 40 to 70% of their yearly compensation. Mot. at 24, 30.  Further, it argues that the policy will likely diminish the bargaining unit because many agents will take Respondent's buy-out offer rather than absorb such significant wage cuts. *Id.* at 29.

Respondent characterizes Petitioner's argument as "baseless" because it relies on the "speculative statements of three self-interested" employees.  Opp. at 22.  After the briefing on the

---

[7] This case and other unpublished Ninth Circuit decisions cited in this Order are not precedent, but may be considered for their persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

1    petition was complete, Respondent submitted an affidavit of AAA's CFO that contained

2    calculations purporting to show that the actual change in compensation would be closer to a 20%

3    reduction based on the agents' actual earnings.  Dkt. No. 45 at 3.  The Court then allowed

4    Petitioner to respond, and she submitted an affidavit attaching the agents' paystubs, which showed

5    that renewal commissions averaged between 51 and 65% of the agents' total gross compensation

6    per year between 2019 and 2023.  Dkt. No. 46 at 2.

7            Weighing this evidence, the Court finds that Petitioner has sufficiently established that

8    elimination of renewal commissions is likely to cause imminent, irreparable harm by significantly

9    reducing agents' pay and potentially driving agents to leave AAA.  In deciding a preliminary

10   injunction motion, the Court may consider Petitioner's affidavits, *see Houdini Inc. v. Goody*

11   *Baskets LLC*, 166 F.App'x 946, 947 (9th Cir. 2006), and they are no more "self-serving" than any

12   of the other evidence presented by one side or the other in this adversary proceeding.  Moreover,

13   even if the elimination of renewal commissions reduced agents' yearly compensation by an

14   amount somewhere between Respondent's and Petitioner's estimates, that amount would be 35%,

15   or approximately a third of their annual income.  It is reasonable to conclude that such a

16   substantial reduction in income is likely to harm employees.  At oral argument, Respondent

17   maintained that Petitioner's fears that the policy change would force many agents to leave AAA

18   were overblown, as only a relatively small number of bargaining unit employees had elected to

19   take the severance package in the 18 months since it was offered.  But it is possible that many

20   agents may be waiting to decide whether to take a buy-out offer until this petition is decided.  In

21   contrast to the ongoing harm allegedly stemming from the AAA I violations that occurred in the

22   past, these imminent harms likely to flow from the elimination of renewal commissions are the

23   kinds of "impending deleterious effect[s] of [a] likely unfair labor practice" that a 10(j) injunction

24   is designed to avoid.  *See Frankl*, 650 F.3d at 1362.

25           Respondent nonetheless argues that an administrative order could alleviate this harm just

26   as effectively.  Opp. at 26.  However, "the Board generally does not order retroactive relief, such

27   as back pay or damages, to rank-and-file employees for the loss of economic benefits that might

28   have been obtained had the employer bargained in good faith." *Frankl*, 650 F.3d at 1363.  In

United States District Court
Northern District of California

addition, the Board views unilateral action with respect to wages, as opposed to other working conditions, as particularly detrimental because "each paycheck reminds [employees] of the likely irrelevance of the union." *E. Bay Auto. Council v. N.L.R.B.*, 483 F.3d 628, 634 (9th Cir. 2007). The elimination of renewal commissions appears to be the most substantial economic proposal impacting employee wages that Respondent will have implemented since the Union was certified. If support for the Union has already diminished, allowing this major disadvantageous shift in the status quo may irremediably harm it.

### b. Failure to Bargain in Good Faith and Other Unilateral Changes

Petitioner seeks relief beyond enjoining the policy eliminating renewal commissions from taking effect. She also asks the Court to prevent Respondent from enforcing any of the other changes it unilaterally implemented as part of the LBFO, and to order Respondent back to the bargaining table. Pet. at 23. However, the Court finds that Petitioner has not sufficiently shown a likelihood of irreparable harm absent this relief.

Like the AAA I violations, the other LBFO policies were all enacted some time ago, in August 2023. According to the Union, the parties had tentatively agreed on 16 of the 22 articles contained in the LBFO. Dkt. No. 44-3 at 3. Still, Petitioner argues that allowing these allegedly unlawful policies to remain in place will cause irreparable harm by further eroding support for the Union. Mot. at 30. This argument is not persuasive for the same reasons that the Court declined to order injunctive relief as to the AAA I violations. Given that a significant amount of time has passed, any weakening of Union support based on these changes is likely to have already occurred some time ago, such that it may "be difficult to recreate the original status quo with the same relative position of the bargaining parties." *See Frankl*, 650 F.3d at 1363. Several of the affidavits Petitioner cites in which employees expressed doubt about the Union's ability to represent them are dated before or soon after the LBFO was first implemented, indicating that support for the Union may already have been low then. *See* Mot. at 29–30. Petitioner fails to clarify how, under these circumstances, an interim order is likely to be more effective at reviving union support than an ALJ or Board order. Similarly, an employer's unlawful refusal to bargain does not constitute irreparable harm if "bargaining could resume without detriment as easily later

as now." *Frankl*, 650 F.3d at 1363.  And based on the record here, the Court finds that Petitioner has failed to establish that resuming bargaining now under an interim order, a year and a half after the last bargaining session, will be more effective than resuming (if found to be warranted) after an ALJ or Board decision in AAA II.

### iv.    Balance of the Equities

If Petitioner has established serious questions going to the merits and a likelihood of irreparable harm, a preliminary injunction may issue if the balance of hardships tips sharply in her favor. *Alliance for the Wild Rockies*, 632 F.3d at 1135.  As detailed above, the Court has determined that there are serious questions going to the merits of Petitioner's claim that Respondent violated the NLRA by unlawfully declaring a bargaining impasse and impermissibly implementing unilateral changes to employees' working conditions.  Further, Petitioner has sufficiently shown that eliminating renewal commissions is likely to cause irreparable harm to employees and the Union.  Respondent argues that it will be disadvantaged by an injunctive order as it would allow Petitioner to obtain relief prior to an "anticipated loss" in AAA I and "circumvent the hearing in AAA II on the eve of trial."  Opp. at 28.  However, an injunction to enjoin the elimination of renewal commissions is much more limited than the sweeping relief Petitioner seeks in AAA I and AAA II, and is narrowly targeted to maintain the status quo so as to avoid a legitimate threat of irreparable harm.  As such, the Court finds that the balance of harms tips sharply in Petitioner's favor.

### v.    Public Interest

The public interest in a Section 10(j) case "is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge."  *Frankl*, 650 F.3d at 1365 (citation and internal quotation marks omitted).  As detailed above, the record casts substantial doubt on the validity of Respondent's declaration of impasse and its subsequent imposition of unilateral changes.  And one of those changes, the elimination of renewal commissions, is likely to cause irreparable harm to the Union and employees.  An order enjoining Respondent from implementing this change serves the public interest in preventing a potential unfair labor practice from harming employees and the Union.

**IV.     CONCLUSION**

The Court **GRANTS IN PART AND DENIES IN PART** the petition, Dkt. No. 1.  The Court **ORDERS** that, pending the final disposition of the matters now pending before the Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, are enjoined and restrained from implementing the policy eliminating renewal commissions for Group A agents set to take effect February 1, 2025.

**IT IS FURTHER ORDERED** that, pending the final disposition of the matters now pending before the Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, shall take the following affirmative steps:

1.   Immediately rescind the policy requiring Group A agents to select a severance package by January 31, 2025;

2.   By 5:00 p.m. on Friday, January 24, 2025, distribute electronic copies of the Order specifying the relief granted to all bargaining unit employees employed by Respondent at its Northern/Central California branch facilities, via email and all intranet or internet sites or apps that Respondent uses to communicate with employees;

3.   By 5:00 p.m. on Monday, January 27, 2025, post physical copies of the Order setting forth the relief granted at each of Respondent's Northern/Central California branch facilities, as well as translations in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Board's Regional Director of Region 32, said translations to be provided by Respondent at Respondent's expense and approved by the Regional Director, on the bulletin board, in all breakrooms, and in all other places where Respondent typically posts notices to its employees, maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements, and grant all employees free and unrestricted access to said postings, and grant to

agents of the Board reasonable access to each worksite to monitor compliance with this posting requirement;

4. By 5:00 p.m. on Tuesday, January 28, 2025, convene one or more mandatory meetings, on working time and at times when Respondent customarily holds employee meetings and scheduled to ensure the widest possible attendance, at each of Respondent's Northern/Central California branch facilities, during which the Injunction Order specifying the relief granted will be read to the employees by a responsible Respondent official in the presence of a Board agent, or at Respondent's option, by a Board agent in the presence of a responsible Respondent official. Respondent shall also afford the Union, through the Regional Director, reasonable notice and opportunity to have a representative present when the Injunction Order is read to employees. Interpreters shall be made available for any individual whose language of fluency is other than English at Respondent's expense. Respondent shall announce the meeting(s) for this Order reading in the same manner it would customarily announce a meeting to employees; the meeting(s) shall be for the above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. Respondent shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise; and,

5. Within twenty-eight (28) days of the issuance of this Order, file with this Court and submit a copy to the Regional Director of Region 20 of the Board, a sworn affidavit from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of this Order, including how it has posted the documents required, how and where the documents have been posted, and the date(s), time(s), and location(s) that the portions of the Order specifying the relief granted was read to employees and by whom.

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS FURTHER ORDERED** that this case shall remain on the docket of this Court and on compliance by Respondent with its obligations described in this Order, and upon disposition of the matters pending before the Board, Petitioner shall cause this proceeding to be dismissed.  This order terminates Dkt. No. 16.

**IT IS SO ORDERED.**

Dated:   1/23/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

22